**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISION**

| | |
|---|---|
| **COURTNEY BLACKMON,** **individually, and on behalf of all** **others similarly situated,** | **CASE NO.:** |
| **Plaintiff,** | **DEMAND FOR JURY TRIAL** |
| **v.** | |
| **TITLEMAX OF GEORGIA, INC.** **D/B/A TITLEMAX AND TMX** **FINANCE LLC,** | |
| **Defendants.** | |

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiff ("Plaintiff" or "Mrs. Blackmon") on behalf of herself and all others similarly situated, alleges the following based upon personal knowledge as to herself, upon information and belief, and the investigation of her undersigned counsel as to all other matters, and brings this class action against Defendants TitleMax of Georgia, Inc., d/b/a TitleMax ("TitleMax") and TMX Finance LLC (altogether, the "Defendants" or "TMX"), as follows:

**I.  NATURE OF THE ACTION**

1.      This Complaint seeks to use the protections provided to active-duty service members by the Military Lending Act, 10 U.S.C. § 987, ("MLA") to void high-interest title loans made to hundreds of soldiers.  The MLA was enacted to

protect United States active-duty service members and their dependents[1] from predatory lending.  Excessive debt endangers our nation's military readiness and impacts service member retention, morale, household stability, security clearances, and career advancement.

2.      Specifically, TMX's standard form Pawn Transaction Disclosure Statement and Security Agreement (the "Agreement") contains several loan terms that are prohibited by the MLA for loans to Covered Members, including:  (1) charging interest above the 36% interest rate cap for the Military Annual Percentage Rate ("MAPR"); (2) failing to provide any required MLA Disclosures; (3) rolling over loans to a Covered Borrower using the proceeds of other credit extended by the same creditor; (4) including a Class Action Ban and Waiver of Jury Trial which is prohibited by the MLA; (5) including a mandatory binding arbitration clause which is prohibited by the MLA; (6) extending credit and servicing loans where the Covered Borrower's vehicle title is used as security for the loan. See, 10 U.S.C. § 987(b),(c),(e)(2)(5)(6).

3.      Plaintiff's standard form Agreement is identified as **Exhibit 1**.

---

[1] Active-duty service members and their dependents are identified throughout the Complaint as "Covered Borrowers" as defined by 32 C.F.R. § 232.3(g)(1).

4.     To protect our active-duty service members and their families, Congress declared that any violation of the MLA renders that loan void from inception.  10 U.S.C. § 987(f)(3).

5.     Upon information and belief, TMX's business practices, that fail to comply with the MLA, are part of a systematic nationwide scheme that violates the MLA for all TMX loans given to active-duty service members or "Covered Borrowers" as defined by the MLA.

6.     Plaintiff is precisely the type of Covered Borrower that Congress and the Department of Defense sought to protect when crafting the MLA.

7.     Plaintiff seeks to represent a class of Covered Borrowers who entered into loan agreements with TitleMax during the class period.  Plaintiff contends that these loans violate the Military Lending Act 10 U.S.C. § 987, *et seq.* in several ways and seeks actual damages, but not less than $500 for each violation, punitive damages, declaratory relief, prejudgment interest, attorneys' fees and costs, and any other relief provided by law.

## II.    JURISDICTION AND VENUE

8.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because the claims advanced arise under the Military Lending Act as set forth at 10 U.S.C. § 987, *et seq.*

8.    Venue is proper in this district pursuant to 10 U.S.C. § 987 and 28 U.S. § 1391 because TMX is doing business in this District, some or all of the pawn loans at issue were provided by Defendants to Plaintiff in this District, and Plaintiff made some or all of her payments to TMX at its location within the District.

9.    Upon information and belief, Plaintiff's loan contract states: "Governing Law: This Agreement and the Pawn involve interstate commerce. Georgia law governs this Agreement[.]" Exhibit 1.

10.    This Court possesses personal jurisdiction because TMX deliberately and regularly conducts business, marketing, distributing, promoting and/or extends consumer credit, in and into Georgia and maintains a brick and mortar store located at 47 North Morningside Drive, Cartersville, Georgia 30121. The title loans at issue are believed to be issued from within the State of Georgia and the monetary funds that are the subject of the title loan agreements are disbursed from financial institutions located in the State of Georgia. Plaintiff received her title pawn loan at a TitleMax location located within this District. TMX has obtained the benefits of the laws of Georgia and profited substantially from Georgia commerce.

### III.    PARTIES

11.    Plaintiff, Courtney Blackmon, is a natural person and resident of Bartow County, Georgia.

4

12.     At all times relevant hereto, Plaintiff was married to an active-duty service member employed by the United States Army, which makes her a Covered Borrower under the MLA.

13.     TitleMax of Georgia, Inc., d/b/a TitleMax is a domestic for profit corporation operating in and into Georgia with its principal place of business located at 15 Bull Street, Suite 200, Savannah, GA 31401.

14.     Defendant TMX Finance LLC is a foreign limited liability company operating in and into Georgia. TMX Finance LLC is a citizen of Delaware.

15.     Defendant TMX Finance LLC has 1 member including TMX Finance Holdings Inc. Citizenship of the LLC is determined by the citizenship of its members.  On information and belief, Member TMX Finance Holdings Inc. is a citizen of Delaware.

## IV.     OVERVIEW OF THE MILITARY LENDING ACT

16.     In August 2006, the Department of Defense ("DOD") investigated loans directed at military families. In its Report (the "Report"),[2] the DOD uncovered a litany of financial issues plaguing our country's military families that directly resulted in a risk to our national security, including a finding that active duty service members had their clearances revoked or denied due to financial

---

[2] https://apps.dtic.mil/sti/pdfs/ADA521462.pdf

problems, and that there was a lack of military readiness and morale caused by excessive debt.[3] Shockingly, a five year study illustrated that between 2000-2005, financial issues resulted in a 1,600 percent increase in financial hardship among the families of Sailors and Marines.[4]

17.     As early as summer 2006, the Report identified serious issues with creditors and predatory lenders offering loans featuring high fees/interest rates and requiring military allotments as a condition of the loan.[56]

18.     To curb usurious interest rates and bogus fees, the DOD requested assistance from Congress.[7] "Specifically, lenders should not be permitted to base loans on prospective bad checks, electronic access to bank accounts, mandatory military allotments, or titles to vehicles."[8]

19.     Predatory lenders like TitleMax make loans based on access to assets (through checks, bank accounts, car titles, tax refunds, etc.) and guaranteed

---

[3] *Id.*

[4] *Id.*

[5] 6 *Id.*

[6] Dr. William O. Brown, Jr., and Dr. Charles B. Cushman, Jr., "Payday Loan Attitudes and Usage Among Enlisted Military Personnel," Consumer Credit Research Foundation, June 27, 2006, p. 10

[7] *Id.*

[8] https://apps.dtic.mil/sti/pdfs/ADA521462.pdf

continued income, but not on the ability of the borrower to repay the loan without experiencing serious financial difficulties.[9]

20.    The DOD identifies title loans like those offered by Defendants as among the worst kind of loans for Covered Borrowers:

Car title lenders make loans secured by the title to vehicles owned free and clear by borrowers. The typical loan is for a fraction of the car's value, costs 300% APR, and has a one-month loan term. Title loans are often renewed month after month, without reduction in principal. Failure to repay can result in repossession of the vehicle …. [T]he high cost and risk of car title loans traps borrowers in repeated loan renewals in order to keep from losing essential transportation and key family assets.[10]

21.    For decades, the DOD requested increased statutory protections for Covered Borrowers from unfair, deceptive lending practices, and usurious interest rates and to require uniform disclosure of credit costs and terms.  The MLA was passed by Congress to protect service members from unfair and deceptive and excessively priced loans.

## V.    FACTS

### A.    Plaintiff's Pawn Loans

22.    For a period of just over two (2) years, Defendants extended Plaintiff Blackmon at least two title pawn loans, refinanced those same loans at least 14 times using the same extended credit in violation of 10 U.S.C. § 987(e)(1), and

---

[9] *Id.*
[10] *Id.*

charged interest at a rate that exceeded the MLA statutory rate cap of 36% MAPR[11] in violation of 10 U.S.C. § 987(b). Each of these violative loan terms constitute separate and independent violations of the MLA. Defendants provided these pawn loans to Plaintiff without a credit check, without conducting any underwriting, and without providing her with the MLA disclosures required by 10 U.S.C. § 987(c) despite knowing that she was a Covered Borrower prior to extending her any consumer credit.

23.    Plaintiff was not aware that the MLA applied to her loans because she did not receive any MLA disclosures.  Had Plaintiff been made aware of the MLA and its limits she would not have entered into the Defendants' loans.

24.    All of Defendants' standard form Agreements required Plaintiff to waive her right to a jury trial and prohibit her from participating in a class action in violation of 10 U.S.C. § 987(e)(2) which prohibits such waivers, and required her to submit to mandatory binding arbitration in violation of 10 U.S.C. § 987(e)(3) which prohibits mandatory arbitration to Covered Members. Worse yet, the Defendants required Plaintiff to secure its usurious loans using her vehicle title in violation of 10 U.S.C § 987(e)(5) of the MLA which prohibits title loans to Covered Members altogether.

---

[11] All of Defendants' title pawn loans to Plaintiff had an MAPR between 100% - 152%.

i.     **Plaintiff's First Loan ("First Loan")**

25.    On or around September 25, 2021, Mrs. Blackmon appeared at Defendants' location at 47 North Morningside Drive Cartersville, Georgia 30121. At that time, Plaintiff met with a TitleMax representative who conducted a walk-around of Plaintiff's vehicle and provided Plaintiff with a credit application. Plaintiff completed the credit application and the TitleMax representative submitted her credit application into its system for approval.

26.    Shortly after submitting Plaintiff's credit application, TitleMax rejected Plaintiff's loan request. **Exhibit 2**. The Defendants' principal reason for initially denying Plaintiff's loan was that she was ineligible as a military Covered Borrower.  Defendant even provided Plaintiff with a Notice explaining why her loan was initially denied:

**TITLEMAX OF GEORGIA, INC. D/B/A TITLEMAX**

**47 NORTH MORNINGSIDE DR**

**CARTERSVILLE, GA 30121**

**(770) 382-2298**

Notice of Action Taken and Statement of Reason(s)

| | | |
|---|---|---|
| **Date:** 2021-09-25 | **Transaction Description:** Credit Application | **Action Taken:** Denial |
| **Applicant Name:** | COURTNEY  BLACKMON | |
| **Applicant Address:** | 137 GROGAN RD NE, WHITE, GA 30184 | |

Dear Applicant:

Thank you for applying to us for credit.  After reviewing your application, we are sorry to advise you that we cannot grant your credit request at this time.

PRINCIPAL REASON(S) FOR CREDIT DENIAL, TERMINATION, OR OTHER ACTION TAKEN CONCERNING CREDIT

We were not able to approve your credit application or offer you credit on the terms requested for the following reason(s):

> Applicant is a military covered borrower and is ineligible for the requested credit product

27.     Accordingly, Defendants had actual knowledge that the MLA applied to any loan given to Plaintiff.

28.     Following its denial of Plaintiff's credit application, TMX's representative walked outside for several minutes. Shortly thereafter, TMX's representative returned and explained to Mrs. Blackmon that ordinarily TMX was unable to offer title loans to military families but would make an exception for her.

29.     As it turns out, Mrs. Blackmon's experience with the Defendants was not unique or a special occasion. In actuality, Defendants extended thousands of

title pawn loans to Covered Borrowers, even after learning that they were ineligible for such loans under the MLA.

30.     Defendants extended Mrs. Blackmon's First Loan via its standard form Agreement on September 25, 2021.[12] The First Loan was a title pawn loan secured by Plaintiff's vehicle title in the amount of $2,518.00. The First Loan was to be paid within 30-days and Defendants charged Plaintiff an MAPR over 100 percent.

31.     In exchange for the First Loan, Plaintiff was required to provide the Defendants with a security interest in her vehicle title, a 2018 Chevrolet Traverse.

32.     The Defendants' First Loan exceeded the MLA statutory interest rate cap of 36% MAPR in violation of 10 U.S.C. § 987(b).

33.     The Defendants' First Loan failed to include mandatory MLA loan disclosures in violation of 10 U.S.C. § 987(c).

34.     The Defendants rolled over, renewed, repaid, refinanced, and/or consolidated the First Loan into a refinance loan (using funds from the First Loan) one (1) time in violation of 10 U.S.C. § 987(e)(1).

35.     Plaintiff made several payments to TitleMax on her First Loan totaling approximately $3,500.00 towards unlawful interest and principal.

---

[12] Plaintiff is not currently in possession of her First Loan dated September 25, 2021.

36.     The Defendants First Loan required Plaintiff to waive her rights to legal recourse under state and federal law by prohibiting her from participating in a class action or jury trial in violation of 10 U.S.C. § 987(e)(2).

37.     The Defendants First Loan required Plaintiff to submit to mandatory binding arbitration in violation of 10 U.S.C. § 987(e)(3).

38.     The Defendants First Loan required Plaintiff to provide her vehicle title as security for the First Loan obligation in violation of 10 U.S.C. § 987(e)(5).

**ii.     Plaintiff's Second Loan ("Second Loan")**

39.     Defendants extended Mrs. Blackmon's Second Loan via its standard form Agreement dated July 27, 2022. The Second Loan was a pawn loan secured by Plaintiff's vehicle title in the amount of $1,318.00. The Second Loan was due within 30-days and Defendants charged Plaintiff an MAPR over 100 percent.

40.     In exchange for the Second Loan, Plaintiff was again required to provide the Defendants with a security interest in her vehicle title, a 2018 Chevrolet Traverse.

41.     Again, Defendants knew that Plaintiff was a Covered Borrower when it extended her the Second Loan.

42.     The Defendants' Second Loan also exceeded the MLA statutory interest rate cap of 36% MAPR in violation of 10 U.S.C. § 987(b).

12

43.     The Defendants' Second Loan also failed to include mandatory MLA loan disclosures in violation of 10 U.S.C. § 987(c).

44.     Upon information and belief, the Defendants rolled over, renewed, repaid, refinanced, and/or consolidated the Second Loan into a refinance loan (using funds from the Second Loan) at least thirteen (13) times, each in violation of 10 U.S.C. § 987(e)(1).

45.     Plaintiff made several payments to TitleMax on her Second Loan totaling approximately $13,500.00 towards unlawful interest and principal.

46.     The Defendants' Second Loan required Plaintiff to waive her rights to legal recourse under state and federal law by prohibiting her from participating in a class action or jury trial in violation of 10 U.S.C. § 987(e)(2).

47.     The Defendants' Second Loan required Plaintiff to submit to mandatory binding arbitration in violation of 10 U.S.C. § 987(e)(3).

48.     The Defendants' Second Loan required Plaintiff to provide her vehicle title as security for the Second Loan obligation in violation of 10 U.S.C. § 987(e)(5).

49.     All of Plaintiff's title pawn loans were used to cover debt and expenses related to her personal, household, and/or family needs.

**B.     TMX's Business Model**

50.     TMX Finance LLC is a privately held company headquartered in Savannah, Georgia. TMX primarily offers vehicle title pawn loans although it has several secured loan options. It originates and services loans that typically range from $100 to $10,000 with terms from 30-days to 48 months. During the relevant time period, TMX operated under several trade names including TitleMax, InstaLoan and TitleBucks. TMX is located in 15 states and maintains over 1,100 stores.[13]

51.     As a title pawn lender, TMX requires Covered Borrowers to provide their vehicle title as a security interest as a condition to its loans.

52.     TMX extends credit through closed-end title pawn loans which are subject to the requirements of the MLA when made to a Covered Borrower, including: interest rate cap of 36% MAPR, mandatory MLA disclosures, and prohibitions against refinance loans, using a vehicle title as a security interest, eliminating legal remedies under state and federal law and requiring mandatory arbitration.

53.     As TMX knows, the Code of Military Conduct requires active-duty service members to pay their debts. If an active-duty service member fails to pay

---

[13] https://www.tmxfinancefamily.com/what-we-do/

his or her debts, the service member may lose his or her security clearance, job, rank, pay, etc.

**C.     The Military Lending Act Prohibits TMX's Title Pawn Loans**

54.     Plaintiff and the Class Members are "covered members," "dependents," and/or "covered borrowers" subject to the protections and limitations imposed by the MLA.   Specifically, 10 U.S.C. § 987(i)(1) of the MLA defines a "covered member" as "a member of the armed forces who is (A) on active duty under a call or order that does not specify a period of 30 days or less; or (B) on active Guard and Reserve Duty".   Section 987(i)(2) of the MLA defines "dependent, with respect to a covered member, [as] a person described in subparagraph (A), (D), (E), or (1) of section 1072(2) of this title".  Section 1072(2) defines "dependent" to include a spouse.  See also, 32 C.F.R. § 232.3(g)(1) (defining "covered borrower" as a "consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a covered member or a dependent of a covered member").

55.     Plaintiff is considered a "covered borrower" with respect to the TMX title pawn loans at issue because Plaintiff is the spouse and dependent of an active-duty service member who is obligated to repay loans that were given to his spouse for personal, family or household purposes.

56.     Defendant is a "creditor" subject to the requirements and limitations imposed by the MLA in that it engaged in the business of extending consumer credit to covered borrowers under the protection of the MLA. 10 U.S.C. § 987(i)(5); *also* 32 C.F.R. § 232.3(i).

57.     The underlying title pawn loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a covered borrower primarily for personal, family, or household purposes," that is subject to a finance charge and does not qualify for any of the identified exceptions. 32 C.F.R. § 232.3(f)(1)(i); *also* 10 U.S.C. § 987(i)(6).

**D.     The Consumer Financial Protection Bureau ("CFPB") and TMX entered into a Consent Order (the "Consent Order") as a result of Defendants' illegal title pawn loans to thousands of Covered Borrowers**

58.     On February 23, 2023, the CFPB and TMX stipulated to a Consent Order addressing TMX's unlawful title pawn loans to Covered Borrowers. The Consent Order and Stipulation are attached as **Exhibit 3** and addresses the specific conduct at issue in this litigation. Although the CFPB identified the unlawful conduct, none of the Covered Borrowers were fully compensated for payments made on unlawful loans and their claims were not released.

59.     The Consent Order outlines many of TMX's violations of federal and state law, including violations of the Military Lending Act 10 U.S.C. § 987, *et seq.*

For the convenience of the Court, Plaintiff presents only the relevant portions of the 53-page Consent Order below.

60.    The Consent Order defines an MLA Relevant Period as October 3, 2016 to February 23, 2023, and the Consent Order remains in effect until February 23, 2028. The relevant terms of the Consent Order are set forth below without typographical alteration:

- On October 3, 2016, the MLA's protections were expanded to prohibit nonbank creditors, like TitleMax, from using vehicle titles to secure loans made to Covered Borrowers. 32 C.F.R. § 232.8(f). (*see* Consent Order, ¶ 35).

- The MLA also limits the Military Annual Percentage Rate associated with extensions of credit to 36%, mandates loan disclosures, prohibits mandatory arbitration, and prohibits unreasonable notice provisions. 10 U.S.C. § 987(b), (e)(3)-(4); 32 C.F.R. 232.4(b), 232.6, 232.8(c)-(d). (*id.* ¶ 36).

- Any credit agreement, promissory note, or other contract with a Covered Borrower that fails to comply with any provision of the MLA or contains one or more prohibited provision is void from the inception of the contract. 10 U.S.C. § 987(f)(3); 32 C.F.R. 232.9(c). (*id.* ¶ 37).

- TitleMax states in its own policy that "Due to the Company's product limitations and requirements set forth in the Military Lending Act, military borrowers, their spouses, and dependents ('covered borrowers') are not eligible for a loan." Despite this statement, between October 3, 2016, and September 17, 2021, TitleMax made 2,670 prohibited loans to Covered Borrowers. (*id.* ¶ 38).

- TitleMax's violations were caused by intentional misconduct, a lack of internal and system controls, and no meaningful monitoring or oversight. In some instances, TitleMax employees conducted checks to verify a consumer's Covered Borrower status, but ignored MLA Database responses indicating that consumers were Covered Borrowers and extended prohibited loans. TitleMax's

system allowed employees to process loans even when TitleMax's system received automated responses that the consumers were verified as Covered Borrowers. (*id.* ¶ 39).

- In other instances, TitleMax changed consumers' personal identifiable information to obtain MLA-Database responses stating that the consumers were not Covered Borrowers. In other case, TitleMax failed to take any steps to verify the consumers' Covered-Borrower status. (*id.* ¶ 40).

- TitleMax did not conduct any periodic monitoring or audits of its origination activity to ensure compliance with the MLA, allowing intentional misconduct and problematic practices to go unchecked. TitleMax made 2,670 prohibited loans to Covered Borrowers, collected payments on those prohibited loans, and, in certain instances, repossessed and sold the Covered Borrowers' vehicles. (*id.* ¶ 41).

- Between October 3, 2016, and September 17, 2021, Respondent made 2,655 title loans to Covered Borrowers. These title loans are void from their inception and Respondent violated the MLA each time it extended and serviced these title loans. 32 C.F.R. §§ 232.8(f), 232.9(c). (*id.* ¶¶ 43-44);

- Between October 3, 2016, and September 17, 2021, Respondent made 2,569 loans to Covered Borrowers with MAPRs greater than 36%, many of those loans had APRs in excess of 100%. These loans are void from their inception and Respondent violated the MLA each time it extended and serviced these loans. 10 U.S.C. § 987(b); 32 C.F.R. § 232.4(b). (*id.* ¶¶ 48-49);

- Between October 3, 2016, and September 17, 2021, Respondent made 2,670 loans to Covered Borrowers without making all loans disclosures required by the MLA. These loans are void from their inception and Respondent violated the MLA each time it extended and serviced these loans. 10 U.S.C. § 987(c); 32 C.F.R. § 232.6(a). (*id.* ¶¶ 52-53);

- Between October 3, 2016, and September 17, 2021, Respondent made 2,670 loans to Covered Borrowers through agreements that require the borrowers to submit to arbitration in the case of a dispute. These loans are void from their inception and Respondent violated the MLA each time it extended and serviced these loans. 10 U.S.C. § 987(e)(3); 32 C.F.R. § 232.8(c). (*id.* ¶¶ 56-57);

- Respondent and its owners, officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not violate sections …. or the Military Lending Act, 10 U.S.C. § 987, or its implementing regulation, 32 C.F.R. part 232, including by: (d) extending or servicing loans that fail to comply with the MLA to Covered Borrowers. (*id.* ¶ 62);

- To preserve the deterrent effect of the civil money penalty in any Related Consumer Action,[14] Respondent may not argue that Respondent is entitled to, nor may Respondent benefit by, any offset or reduction of any compensatory monetary remedies imposed in the Related Consumer Action because of the civil money penalty paid in this action or because of any payment that the Bureau makes from the Civil Penalty Fund. If the court in any Related Consumer Action offsets or otherwise reduces the amount of compensatory monetary remedies imposed against Respondent based on the civil money penalty paid in this action or based on any payment that the Bureau makes from the Civil Penalty Fund, Respondent must, within 30 days after entry of a final order granting such offset or reduction, notify the Bureau, and pay the amount of the offset or reduction to the U.S. Treasury. Such payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalty imposed in this action. (*id.* ¶ 89).

- TMX's Chief Executive Officer, Tracy Young, executed the Stipulation and Consent to the Issuance of a Consent Order on February 22, 2023.

61.    This Class Action seeks to fill the void left by the CFPB Consent Order

by obtaining actual damages incurred by the class, including but not less than $500

for each violation, punitive damages, declaratory relief, attorneys' fees, legal costs,

---

[14] The Consent Order's definition of "Related Consumer Action" refers to a private action by or on behalf of one or more consumers or an enforcement action by another governmental agency brought against Respondent based on substantially the same facts as described in § IV of this Consent Order. For this Court's reference, Consent Order § IV refers to the Bureau's Findings and Conclusions. Exhibit 3.

and any other relief provided by law for Covered Borrowers like Plaintiff and the Class, who had title pawn loans that conditioned repayment by using a vehicle title as a security interest and/or interest rates that exceed 36% MAPR, among many other MLA violations.

## VI.    CLASS ALLEGATIONS

62.    Plaintiff brings this case as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure. The proposed Class includes:

> All MLA Covered Borrowers in the United States that entered into a Pawn Transaction Disclosure Statement and Security Agreement in substantially the same form as Exhibit 1 during the Class Period.

63.    Expressly excluded from the Class are: (a) any Judge presiding over this action and members of their families; (b) Defendants and any entity in which Defendants have a controlling interest, or which has a controlling interest in Defendants, and its legal representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion from the Class.

64.    The Class Period is five (5) years prior to the original filing date of this action.

65.    Plaintiff reserves the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

**Rule 23(a) Criteria**

66.    Numerosity. TMX's scheme has harmed and continues to harm Covered Borrowers.  The members of the proposed Class are so numerous that joinder of all members is impracticable.  TMX consented to the issuance of the Consent Order whereby the CFPB found that TMX had illegally extended over 2,000 pawn loans to Covered Borrowers.  The sheer volume of its military pawn loan business supports a finding of numerosity.

67.    The exact number of Class members is unknown as such information is in the exclusive control of the Defendants.  However, upon information and belief, TMX has issued thousands of loans to (a) Covered Borrowers that exceeded 36% MAPR; (b) do not contain mandatory MLA disclosures; (c) uses previously extended consumer credit to refinance or roll-over into a new pawn loan; (d) required Covered Borrowers to waive their right to bring a class action or jury trial; (e) included mandatory arbitration provisions; and (f) required that the Covered Borrower give TMX a security interest in their vehicle title.

68.    Due to the nature of the consumer loans involved and the fact that TMX has more than 1,000 locations in 15 states, some of which are deliberately

located near military bases, and provides loans to Covered Borrowers stationed

worldwide, Plaintiff believes the Class easily consists of thousands of consumers.

The Defendants' locations are geographically dispersed throughout the United

States, including locations in Alabama, Arizona, Florida, Georgia, Illinois,

Mississippi, Missouri, Nevada, South Carolina, Tennessee, Texas, and Virginia,

thus making joinder of all Class members impracticable.

69.    Commonality. Common questions of law and fact affect the right of

each Class member and common relief by way of damages is sought for Plaintiff

and Class members.

70.    The harm that TMX has caused or could cause is substantially

uniform with respect to Class members. Common questions of law and fact that

affect the Class members include, but are not limited to:

a.    Whether Plaintiff and the Class members are "covered borrowers,"

"covered members," and "dependents," subject to the protections and

limitations of the MLA;

b.    Whether Defendants are a "creditor" subject to the protections and

limitations of the MLA;

c.    Whether Defendants' pawn loans constitute an extension of

"consumer credit" subject to the protections and limitations of the

MLA;

d.      Whether TMX entered into standard form Pawn Transaction Disclosure Statement and Security Agreements with Covered Borrowers;

e.      Whether the Defendants learned of Covered Borrowers' ineligibility prior to extending them consumer credit;

f.      Whether the Defendants pawn loans exceed the MLA statutory rate cap of 36% MAPR;

g.      Whether the Defendants failed to provide required MLA disclosures in violation of the MLA;

h.      Whether the Defendants rolls over, renews, repays, refinances, or consolidates any consumer credit extended to an existing Covered Borrower using the proceeds of other TMX pawn loans;

i.      Whether the Defendants standard form Pawn Transaction Disclosure Statement and Security Agreements contain a class waiver provisions or jury trial waiver provision in violation of the MLA;

j.      Whether the Defendants standard form Pawn Transaction Disclosure Statement and Security Agreements contain binding arbitration clauses in violation of the MLA;

k.      Whether TMX pawn loans are conditioned upon giving TMX a security interest in the Covered Borrower's vehicle title;

l.    Whether Defendants' pawn loans to Covered Borrowers are unlawful and void from inception due to violations of the MLA;

m.    Whether members of the Class have sustained damages and, if so, the proper measure of such damages;

n.    Whether Defendants are subject to punitive damages, and, if so, the proper measure of such damages and remedies to which Plaintiff and the Class are entitled to under 10 U.S.C. § 987(f)(5);

o.    Whether the Defendants are jointly and severally liable for the violations of the MLA committed;

p.    Any declaratory and/or injunctive relief to which the Classes are entitled.

71.    Typicality. The claims and defenses of the representative Plaintiff are typical of the claims and defenses of the Class because Plaintiff is a Covered Borrower and her pawn loan transactions with the Defendants were typical of the type of personal, household, or family loans that Defendants normally provide to Covered Borrowers. The documents involved in the transaction were standard form documents and the violations are statutory in nature. Plaintiff suffered damages of the same type and in the same manner as the Class she seeks to represent. There is nothing peculiar about Plaintiff's claims.

72.     Adequacy. The representative Plaintiff will fairly and adequately assert and protect the interests of the Class. Plaintiff has hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Class and Plaintiff has no conflict of interest that will interfere with maintenance of this class action.

## Rule 23 (b) Criteria

73.     Predominance and Superiority. A class action provides a fair and efficient method for the adjudication of this controversy for the following reasons:

a.     The common questions of law and fact set forth herein predominate over any questions affecting only individual Class members. The statutory claims under the MLA require a simple identification of those consumers who are Covered Borrowers under the statute, and an act in violation of the MLA;

b.     Moreover, Plaintiff can identify members of each class once Defendants provide a list of all Covered Borrowers[15] with Pawn Transaction Disclosure Statement and Security Agreements where TMX's interest exceeds the statutory rate cap of 36%, TMX did not provide MLA disclosures, where TMX refinanced the loan using

---

[15] Pursuant to the Consent Order, TMX is required to maintain a list of all Covered Borrowers where it issued a pawn loan between October 3, 2016 and present day.

other consumer credit that it had extended to the Covered Borrower, where TMX requires the Covered Borrower to waive their right to a jury trial or to participate in a class action, where TMX's Agreements contains a binding arbitration clause, and where TMX required a Covered Borrower to identify their vehicle title as a security interest;

c.   Prosecution of thousands of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications against Defendant and could create incompatible standards of conduct;

d.   Adjudications with respect to individual members of the Class could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications, or substantially impair their ability to protect their interests; and

e.   The claims of the individual Class members are small in relation to the expenses of litigation, making a Class action the only viable procedural method of redress in which Class members can, as a practical matter, recover.

74.   Defendants have acted and refused to act on grounds generally applicable to the Class, thereby making declaratory relief and corresponding final injunctive relief under Rule 23(b)(2) appropriate with respect to the Class as a

whole.  Defendant should be enjoined from making loans to Covered Borrowers in violation of the MLA and a declaration should be made that the loans are void from inception and that Defendant must return all vehicle titles to Covered Borrowers.

**COUNT I**
**Violation of the Military Lending Act**
**10 U.S.C. §987, *et seq.***
**(The Class)**

75.     Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-74 as if set forth fully herein.

76.     Plaintiff was a "covered borrower" and "covered member" as those terms are defined pursuant to 32 C.F.R. § 232.3(g)(1) and (g)(3), 10 U.S.C. § 1072(2)(A).

77.     TMX was a "creditor" which extended "consumer credit" to Plaintiff as those terms are defined in 32 C.F.R. §232.3(h) and (i).

78.     The Defendants violate the MLA in at least six (6) separate ways: (1) charging interest above the 36% interest rate cap for the Military Annual Percentage Rate; (2) failing to provide any required MLA Disclosures; (3) including a Class Action Ban and Waiver of Jury Trial which is prohibited by the MLA; (4) including a mandatory binding arbitration clause which is prohibited by

the MLA; (5) extending credit and servicing loans where the Covered Borrower's vehicle title is used as security for the loan; and (6) rolling over loans to a Covered Borrower using the proceeds of other credit extended by the same creditor. See, 10 U.S.C. § 987(b),(c),(e)(2)(5)(6).

A.   <u>**Interest Rate Cap Violations**</u>

79.   Within five (5) years of the original filing date of this case, TMX violated the MLA's prohibition against extending consumer credit that exceeds the statutory interest rate cap of 36% MAPR.

80.   In her First Loan, Second Loan, and all fourteen (14) refinances of those same loans, Plaintiff entered into TMX's standard form Agreements, which was utilized for all class members, that issued pawn loans with interest that exceeds the MLA statutory rate cap of 36% MAPR in violation of 10 U.S.C. § 987(b); 32 C.F.R. §232.4(c).

81.   As a result of TMX's unlawful interest rates exceeding 36%, TMX violated the MLA and Plaintiff suffered actual damages by paying interest on loans in excess of the MLA's statutory rate cap of 36% MAPR.

82.     Each payment that Plaintiff and the Class made to repay interest on TMX's illegal loans constitutes a separate and independent violation of the MLA and for voiding the pawn loan agreements of Plaintiff and the Class.

**B.     MLA Disclosure Violations**

83.     10 U.S.C. § 987(c)(1)(A) and 32 C.F.R. § 232.6 makes mandatory the following disclosures in all extension of consumer credit to Covered Borrowers:

(a) Required information. With respect to any extension of consumer credit (including any consumer credit originated or extended through the internet) to a covered borrower, a creditor shall provide to the covered borrower the following information before or at the time the borrower becomes obligated on the transaction or establishes an account for the consumer credit:

(1) A statement of the MAPR applicable to the extension of consumer credit;

(2) Any disclosure required by Regulation Z, which shall be provided only in accordance with the requirements of Regulation Z that apply to that disclosure; and

(3) A clear description of the payment obligation of the covered borrower, as applicable. A payment schedule (in the case of closed-end credit) or account-opening disclosure (in the case of open-end credit) provided pursuant to paragraph (a)(2) of this section satisfies this requirement.

....

(c) Statement of the MAPR—

(1) In general. A creditor may satisfy the requirement of paragraph (a)(1) of this section by describing the charges the creditor may impose, in accordance with this part and subject to the terms and conditions of the agreement, relating to the consumer credit to calculate the MAPR. Paragraph (a)(1) of this section shall not be construed as requiring a creditor to describe the MAPR as a numerical value or to describe the total dollar amount of all charges

in the MAPR that apply to the extension of consumer credit.

(2) Method of providing a statement regarding the MAPR. A creditor may include a statement of the MAPR applicable to the consumer credit in the agreement with the covered borrower involving the consumer credit transaction. Paragraph (a)(1) of this section shall not be construed as requiring a creditor to include a statement of the MAPR applicable to an extension of consumer credit in any advertisement relating to the credit.

(3) Model statement. A statement substantially similar to the following statement may be used for the purpose of paragraph (a)(1) of this section: "Federal law provides important protections to members of the Armed Forces and their dependents relating to extensions of consumer credit. In general, the cost of consumer credit to a member of the Armed Forces and his or her dependent may not exceed an annual percentage rate of 36 percent. This rate must include, as applicable to the credit transaction or account: The costs associated with credit insurance premiums; fees for ancillary products sold in connection with the credit transaction; any application fee charged (other than certain application fees for specified credit transactions or accounts); and any participation fee charged (other than certain participation fees for a credit card account)."

84.     TMX's standard form Agreements to Plaintiff and the Class do not contain any "Statement of MAPR" either in the form of the charges necessary to calculate the MAPR or through the inclusion of the MLA Model Statement.

85.     Within five (5) years of the original filing date of this case, TMX violated the MLA and its implementing regulations by extending consumer credit without any MLA disclosures in violation of 10 U.S.C. § 987(c); 32 C.F.R. § 232.6(a) and (c).

86.    In her First Loan, Second Loan, and all fourteen (14) refinances of those same loans, Plaintiff entered into TMX's standard form Agreements which were utilized for all Class Members, that failed to contain any MLA disclosures.

87.    Plaintiff was not aware that the MLA applied to her loans because she did not receive any MLA disclosures.  Had Plaintiff been made aware of the MLA and its limits she would not have entered into the Defendants' loans.

88.    As a result of TMX's failure to provide mandatory MLA disclosures, TMX violated the MLA and Plaintiff and Class Members suffered actual damages.

C.    **Class Action Ban and Waiver of Jury Trial Violations**

89.    10 U.S.C. § 987(e)(2) of the MLA prohibits creditors from requiring Covered Borrowers to "waive the borrower's rights to legal recourse under any otherwise applicable provision of State or Federal law."

90.    All of Plaintiff's standard form Agreements include a class action waiver provision which specifically required Plaintiff and all Class Members to agree "For Disputes subject to this Clause, you give up your right to: (5) Bring or be a class member in a class action or class arbitration."

91.    Additionally, all of Plaintiff's standard form Agreements include a jury trial waiver provision which specifically required Plaintiff and all Class Members to agree:

JURY TRIAL WAIVER: YOU AND WE ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT. THIS RIGHT MAY BE WAIVED UNDER CERTAIN CONDITIONS AS ALLOWED BY LAW. YOU AND WE KNOWINGLY AND VOLUNTARILY WAIVE ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION ARISING OUT OF OR RELATED DIRECTLY OR INDIRECTLY TO EACH OF THE FOLLOWING: (A) THIS AGREEMENT; AND (B) THE PAWN THAT IS THE SUBJECT OF THIS AGREEMENT. THIS JURY TRIAL WAIVER WILL NOT CHANGE ANY ARBITRATION CLAUSE TO WHICH YOU AND WE ARE SUBJECT, WHICH CONTAINS ITS OWN SEPARATE JURY TRIAL WAIVER.

Exhibit 1.

92.     Upon information and belief, all of TMX's standard form Agreements required Class Members to waive their rights to participate or bring a class action or waive their rights to a jury trial.

93.     The right to participate in a class action and jury trial stem from the Rules of Civil Procedure under both State and Federal law, including the right to bring this class action under the MLA.

94.     As a result of unlawfully requiring Covered Borrowers to waive their rights to file or participate in any class action lawsuit or jury trial in violation of 10 U.S.C. § 987(e)(2) of the MLA, the Agreements of Plaintiff and all Members of the Class are "void from inception" pursuant to 10 U.S.C. § 987(f)(3) and 32 C.F.R. § 232.9(c).

**D.     Mandatory Binding Arbitration Clause Violations**

95.     10 U.S.C. § 987(e)(3) of the MLA prohibits creditors like TMX from requiring Covered Borrowers to submit to mandatory arbitration.

96.    TMX's standard form Agreements include a binding mandatory arbitration clause with no exceptions for Covered Borrowers under the MLA, including all pawn loans entered into with Plaintiff.

97.    Specifically, TMX's Agreements include the following arbitration provision, in part, "By signing below, you agree to this Waiver of Jury Trial and Arbitration Clause." Moreover, TMX confirms that arbitration is mandatory "THIS JURY TRIAL WAIVER WILL NOT CHANGE ANY ARBITRATION CLAUSE TO WHICH YOU AND WE ARE SUBJECT." Exhibit 1.

98.    The Agreements between TMX and Plaintiff are seven total pages, and TMX's mandatory arbitration provision takes up three of seven pages.

99.    As a result of unlawfully requiring Covered Borrowers to enter into pawn loan agreements containing mandatory arbitration provisions in violation of 10 U.S.C. § 987(e)(3) of the MLA, the pawn loan agreements of Plaintiff and all Class Members are "void from inception" pursuant to 10 U.S.C. § 987(f)(3) and 32 C.F.R. § 232.9(c).

**E.    Security Interest Violations**

100.    TMX has always conditioned its loans to Covered Borrowers on the granting of a security interest in their vehicle title in violation of 10 U.S.C. § 987(e)(5).

101.    TMX required Plaintiff to grant it a security interest in her vehicle title.

102.    TMX required all Class Members to grant it a security interest in their vehicle titles.

103.    TMX's standard form Agreements entered into with Plaintiff and the Class contain identical language and explains "Failure to make your payment as described in this document can result in the loss of your motor vehicle." Exhibit 1. TMX required that Plaintiff and the Class also agree that "the pawnbroker can also charge you certain fees if he or she actually repossesses the motor vehicle." Exhibit 1.

104.    As such, TMX's Agreements required Covered Borrowers to provide an exclusive security interest in their vehicle title to TMX until the loan is repaid, a blatant violation of the MLA's Security Interest prohibitions in § 987(e)(5).

105.    Plaintiff and Class Members' damages are a direct and proximate result of TMX's violation of 10 U.S.C. § 987(e)(5), which prohibits creditors like TMX from taking "the vehicle title as a security for the obligation" when proving a pawn loan to a Covered Borrower.

106.    Plaintiff and Class Members have been harmed and suffered actual damages by granting TMX an unlawful security interest in their motor vehicles in violation of 10 U.S.C. § 987(e)(5).

**F.    Refinance Loan Violations**

107.    TMX refinanced Plaintiff's First Loan one (1) time using proceeds of

34

other consumer credit extended by TMX to Plaintiff. TMX rolled over, renewed, repaid, refinanced, or consolidated Plaintiff's First Loan in violation of 10 U.S.C. § 987(e)(1).

108.   TMX refinanced Plaintiff's Second Loan thirteen (13) times using proceeds of other consumer credit extended by TMX to Plaintiff. TMX rolled over, renewed, repaid, refinanced, or consolidated Plaintiff's Second Loan in violation of 10 U.S.C. § 987(e)(1).

109.   TMX's standard form Agreements executed by Plaintiff and the Class plainly permits Covered Borrowers to use proceeds from other credit extended by TMX to pay down or pay off other rolled over, renewed, repaid, refinanced, or consolidated loans extended by TMX. In fact, TMX refinanced Plaintiff's pawn loans at least fourteen (14) times, each a separate violation of § 987(e)(1).

110.   The MLA's "Penalties and remedies" subsection provides, in part, that "any credit agreement, promissory note, or other contract prohibited under this section is void from the inception of such contract." 10 U.S.C. §987(f)(3).

111.   Accordingly, all Class members' standard form Agreements that contain one or more of the six (6) violations mentioned herein are void and must be rescinded with restitution for all amounts paid by Plaintiff and Class members to TMX.

112.    Each and every payment made by Plaintiff and Class members on the void loan Agreements constitutes a separate violation and independent violation of the MLA.

113.    As a direct and proximate cause of TMX's violations, Plaintiff and the Class are entitled to actual damages of not less than $500 for each separate violation, as well as punitive damages and declaratory relief pursuant to 10 U.S.C. § 987(f)(5)(A).

114.    Plaintiff and the Class are entitled to attorneys' fees and costs pursuant to 10 U.S.C. § 987(f)(5)(B).


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter an Order:

a.    Certifying this action as a class action as provided by Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as Class Representative, and appointing undersigned attorneys and their firms as Class Counsel;

b.    Declaring that Defendants violated the MLA, and adjudging that Plaintiff and Class Members' standard form Agreements are void and determining appropriate relief in the form of rescission, restitution, or reformation;

c.  Adjudging that Defendants violated the MLA and award Plaintiff and Class members actual damages of not less than $500 for each violation pursuant to 10 U.S.C. § 987(f)(5)(A)(i);

d.  Adjudging that Defendants violated the MLA and award Plaintiff and Class Members punitive damages pursuant to 10 U.S.C. § 987(f)(5)(A)(ii);

e.  Awarding Plaintiff, and all those similarly situated, reasonable attorneys' fees and costs incurred in this action pursuant to 10 U.S.C. § 987(f)(5)(B);

f.  Enjoin the Defendants from further financing to Covered Borrowers where it refinances loans using proceeds of other credit that it offered to the same Covered Borrowers;

g.  Enjoin the Defendants from further financing to Covered Borrowers where it offers loans in excess of the MLA's statutory rate cap of 36% MAPR;

h.  Enjoin the Defendants from further financing to Covered Borrowers where it requires as a condition to a loan that a Covered Borrower give a security interest in their vehicle title;

i.  Awarding Plaintiff, and all those similarly situated, any pre-judgment and post-judgment interest as may be allowed under the law; and

j.  Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all issues so triable.

### LR 5.1 Certification

Plaintiff's counsel hereby certifies that this Complaint has been prepared using a

font and point selection that complies with Local Rule 5.1(B).


Dated: February 24, 2024                Respectfully submitted,

                                        **SKAAR & FEAGLE, LLP**

                           by:    /s/ Justin T. Holcombe
                                  Justin T. Holcombe
                                  Georgia Bar No. 552100
                                  jholcombe@skaarandfeagle.com
                                  Kris Skaar
                                  Georgia Bar No. 649610
                                  kskaar@skaarandfeagle.com
                                  133 Mirramont Lake Drive
                                  Woodstock, GA  30189
                                  770 / 427-5600
                                  404 / 601-1855 fax

                                  James M. Feagle
                                  Georgia Bar No. 256916
                                  jfeagle@skaarandfeagle.com
                                  Cliff R. Dorsen
                                  Georgia Bar No. 149254
                                  cdorsen@skaarandfeagle.com
                                  Chelsea R. Feagle
                                  Georgia Bar No. 110863
                                  cfeagle@skaarandfeagle.com

2374 Main Street,   Suite B
Tucker, GA 30084
404 / 373-1970
404 / 601-1855 fax

**VARNELL & WARWICK, P.A.**

Brian Warwick, FBN: 605573
(*pro hac vice forthcoming*)
Janet Varnell, FBN: 71072
(*pro hac vice forthcoming*)
Christopher J. Brochu, FBN: 1013897
(*pro hac vice forthcoming*)
400 N. Ashley Drive, Suite 1900
Tampa, Florida 33602
Telephone: 352-753-8600
Fax Number: 352-504-3301
bwarwick@vandwlaw.com
jvarnell@vandwlaw.com
cbrochu@vandwlaw.com
ckoerner@vandwlaw.com

***Attorneys for Plaintiff and on behalf
of all others similarly situated***